IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 15-cv-01132-PAB-KLM

MARION BRECHEISEN,

    Plaintiff,

v.

BLUE COLLAR PRODUCTION, LLC,

    Defendant.
_____

**ORDER**
_____

This matter comes before the Court on the Joint Stipulation and Motion to Dismiss [Docket No. 96] filed by plaintiff Marion Brecheisen and defendant Blue Collar Production, LLC.

Pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure, the Court may order dismissal on terms that it deems proper upon motion of the parties. The Court finds that dismissal of all pending claims in this matter is proper.

The Court finds that the parties have agreed to ratify and enforce the Exclusive Patent and Trademark License Agreement of March 26, 2015 ("EPTLA") as amended by the Amendment to Exclusive Patent and Trademark License Agreement of February 7, 2017 ("Amendment") (collectively, "EPTLA, As Amended"). The EPTLA, As Amended is attached hereto as Exhibit A and its terms incorporated into this Order. Therefore, it is

**ORDERED** that the Joint Stipulation and Motion to Dismiss [Docket No. 96] is granted. It is further

**ORDERED** that the EPTLA, As Amended represents the agreement of the parties as a settlement of this case and may be enforced by specific performance for as long as the Court retains jurisdiction of this matter and of the parties pursuant to this Order. It is further

**ORDERED** that the Court will retain jurisdiction of this case for the purpose of specifically enforcing the following obligations set forth in the EPTLA, As Amended:

    A.    Plaintiff Marion Brecheisen's obligation to provide all records, materials, and any other information related to the Intellectual Property in his possession, custody, or control, including all patent prosecution materials and any information relating to the patent validity and the claim scope on or before March 31, 2017;

    B.    Plaintiff Marion Brecheisen's obligation to make himself available within ninety days upon a mutually agreeable date and time to be interviewed by defendant Blue Collar Production, LLC's patent counsel at the law offices of plaintiff's counsel, concerning the Intellectual Property; and

    C.    Plaintiff Marion Brecheisen's obligation to provide all reasonable documents to enable Blue Collar Production to move forward on the EPTLA, As Amended, including information in his possession, custody, or control concerning the Intellectual Property. It is further

**ORDERED** that, pursuant to Fed. R. Civ. P. 41(a), all of plaintiff's claims against defendant are dismissed with prejudice and all of defendant's claims against plaintiff are dismissed with prejudice, with each party to bear his or its own attorney's fees and costs.

DATED February 15, 2017.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge

# EXCLUSIVE PATENT AND TRADEMARK LICENSE AGREEMENT

This Exclusive Patent and Trademark License Agreement ("**Agreement**") is entered into by Marion Brecheisen ("**Licensor**") and Blue Collar Production, LLC, a Texas limited liability company, ("**Licensee**") (collectively, the "**Parties**"), and shall be effective as of April 15, 2015 ("**Effective Date**").

## RECITALS

WHEREAS, Licensor is the owner of U.S. Patent No. 7,490,674, U.S. Patent No. 7,600,563, and U.S. Trademark Registration No. 3462863;

WHEREAS, The Parties desire to co-fund further development of products that are the subject of this Agreement;

WHEREAS, Licensee desires to obtain the right to purchase inventory owned by Licensor;

WHEREAS, Licensor desires to grant Licensee rights to products more fully described below in exchange for royalty payments and other consideration more fully described below;

WHEREAS, Licensee desires to be granted such license pursuant to the terms set forth below;

NOW THEREFORE, in consideration of the mutual covenants herein, Licensor and Licensee agree as follows:

## DEFINITIONS

1.1 "**Licensed Products**" shall mean: (a) the intellectual property owned now or later by Licensor (the "**Intellectual Property**") related to pump jacks for the extraction of fluids from subsurface formations, which includes but is not limited to, U.S. Patent No. 7,490,674, U.S. Patent No. 7,600,563, and U.S. Trademark Registration No. 3462863, as well as all reissues, continuations, continuations-in-part, revisions, extensions, reexaminations, and foreign counterparts of said patents and trademarks; and (b) all Licensor's knowledge and confidential information related to the Intellectual Property. Licensed Products does not include any software applications that may exist or be later developed to work in conjunction with the Intellectual Property.

1.2 "**Franchise Fee**" shall mean $30,000 per month payable to Licensor and $2,500 per month payable to Vicki Peters until the end of her life while this Agreement remains in effect. These monies are not to be included as part of the Profits Royalty.

1.3 "**Profits Royalty**" shall mean 10% (ten percent) of Licensee's cumulative profit (which shall exclude a deduction for the Franchise Fee) from the Effective Date forward from the Licensed Products before income tax (the "**Royalty Base**") payable to Licensor. The Royalty Base shall not include profits derived from any software applications related to the Licensed Products that may exist or be later developed.

1.4 "**$**" means United States dollars.

## DEVELOPMENT

2.1    The Parties mutually agree that they will each fund 50% (fifty percent) of the costs to improve the Licensed Products for building the nitrogen regulator cylinders of the prototype at a joint cost not to exceed $20,000.

2.2    Intellectual property developed with funds cited above shall belong to Licensor and be subject to this Agreement.

## INVENTORY PURCHASE

3.1    Licensee shall have the right to purchase any and all inventory related to the Licensed Products belonging to Licensor at cost or a mutually agreed upon price. Licensee may ship the inventory to a location of its choice prior to purchase, but Licensee shall bear the freight cost in both directions if it elects to return Licensor's inventory unused.

## GRANT

4.1    Licensor hereby grants to Licensee, who accepts it, an exclusive right and license to perform all actions Licensor may perform with regard to the Licensed Products, including but not limited to, to make, have made, assemble, use, import, export, market, advertise, lease, distribute, sell, or service the Licensed Products worldwide.

4.2    Licensee shall have the right to sublicense any or all of the rights granted herein, so long as Licensor receives the royalties and payments due from Licensee. However, Licensee shall not have the right to assign this Agreement without the written consent of Licensor, except that Licensee may assign this Agreement to a successor who is purchasing or otherwise acquiring substantially all of the assets of Licensee to which this Agreement relates and who agrees to be bound by all obligations of this Agreement.

4.3    Licensee may subcontract to third parties any or all of its rights to the Licensed Products provided that Licensee remains responsible for the performance of the obligations deriving from this Agreement.

4.4    All Parties to whom Licensee sublicenses or subcontracts under this Agreement shall sign binding confidentiality agreements prior to building, manufacturing, or assembling the Licensed Products.

4.5    <u>For the avoidance of doubt, this grant does not transfer ownership of any of Licensor's Intellectual Property or any other property, but only grants the rights licensed hereunder for the term of this Agreement.</u>

## ROYALTIES AND PAYMENTS

5.1    In consideration of the rights granted to Licensee under this Agreement, Licensee agrees to pay the Franchise Fee on a monthly basis by the 20th day of each month, with a grace period not to exceed ten (10) days. In addition, Licensee agrees to pay the Profits Royalty on a quarterly basis by the 20th day of May, August, November, and

February for the Profits Royalty due as of the respective calendar quarters ended March, June, September, and December. The first ten percent (10%) of this payment, up to a cumulative total of $100,000, shall be deposited into a savings account established for Licensor to defend the patents and for patent legal fees.

5.2 For purposes of calculating the Royalty Base, Licensee shall use the cash method of accounting.

5.3 As additional consideration, Licensee agrees to provide Licensor a company credit card for the payment of business expenses associated with the Licensed Products and to purchase for Licensor a 2016 fully equipped Limited Edition Lincoln Navigator identical to the existing 2011 model, by December 31, 2015.

5.4 In consideration of the time necessary for Licensee to evaluate the patents of the Licensed Products, Licensee's Franchise Fee obligation shall begin on September 1, 2015, (the "**Diligence Date**") although the grant described in Section 4 herein is effective as of the Effective Date. In addition, Licensee shall deposit $97,500 into the escrow account of Licensor's banker on the Effective Date to be released as a credit to Licensor against the Franchise Fee on the Diligence Date.

5.5 During the period from April 15, 2015 to July 15, 2015, Michael Brecheisen agrees to assist Licensee in all mutually agreed upon matters related to this Agreement on a contract basis at the rate of $4,000 per month.

## ACCESS TO RECORDS

6.1 Licensee agrees to deliver quarterly statements to Licensor showing the calculation of the Profits Royalty during the preceding calendar quarter at the address listed for Licensor under this Agreement or modified later by Licensor in writing and delivered to Licensee.

6.2 Licensee shall keep true and accurate records of the transactions and data necessary to calculate the Profits Royalty for a period of one year from the date of each such quarterly statement delivered to Licensor. Licensor shall have the right to inspect such records at Licensor's expense, provided that Licensor shall hold such records private and confidential, and not disclose them or information contained therein to any third parties.

6.3 Licensee shall have the right to inspect any and all such records of Licensor related to the Licensed Products, including but not limited to, the intellectual property, technical and engineering records, and records relating to the history, development, marketing and sale, of the Licensed Products.

### REPRESENTATIONS AND WARRANTIES

7.1 Licensor represents and warrants that he: (a) is the sole owner of and has the sole right to assign the Licensed Products; and (b) has the sole right to assign the rights, licenses and privileges outlined in Section 4 of this Agreement.

7.2 Licensor represents that he will not grant or attempt to grant the rights, licenses, and privileges outlined in Section 4 of this Agreement to any other person or entity during the term of this Agreement, or to grant or attempt to grant any rights, licenses, or privileges to any other person or entity that are inconsistent with the rights granted to Licensee herein.

7.3 Licensor represents and warrants that he will take all steps necessary and file all necessary documents with the United States Patent and Trademark Office to ensure all trademarks and patents licensed hereunder remain live and valid.

7.4 Licensee represents and warrants that it shall maintain sufficient insurance associated with use of the Licensed Products, including general and product liability insurance.

### DISPUTES OVER INTELLECTUAL PROPERTY AND PATENT PROSECUTION

8.1 In the event that: (1) either Party believes it necessary to take non-judicial steps to preserve or defend the Intellectual Property, or (2) any third party threatens or institutes any judicial proceeding that could result in the cancellation or limiting of any of the Intellectual Property, Licensor shall be responsible for ten percent (10%) of the costs of such defense and Licensee shall be responsible for the remainder of the costs of such defense. Licensee shall be responsible for administering and managing the work, including the hiring and supervision of third parties, including but not limited to attorneys, accountants, experts, and the like. Each Party shall keep the other party informed of all developments relating to the prosecution and defense of the Intellectual Property.

8.2 Upon learning of any third party infringement of the intellectual property, each Party to this Agreement shall inform the other Party to this Agreement in writing of that fact, and shall supply the other Party with any evidence in its possession pertaining to the third party infringement. Licensee shall have the primary duty to respond to any threat, including asserting an infringement claim against any third party, of which 10% (ten percent) of such costs shall be borne by Licensor and the remainder by Licensee; provided, however, that Licensor may opt out paying for its share of the cost to respond to such threat, in which case Licensee shall be entitled to retain all of the proceeds received or to be received as a result of prosecuting such infringement claims. If Licensee decides not to assert an infringement claim against a third party, then Licensee shall timely inform Licensor of said decision, and Licensor shall have the option to assert an infringement claim against such third party at its sole expense and shall be entitled to retain all of the proceeds received or to be received as a result of prosecuting such infringement claim.

## TERM

9.1   The term of this Agreement is for the life of the last to expire or otherwise terminate of the patents of the Licensed Products, unless terminated under Section 10 of this Agreement.

## TERMINATION

10.1   If Licensee ceases operations without assigning this Agreement to another party under the provisions of Section 4 herein, Licensor or Licensee may terminate this Agreement by written notice to the other Party to either take effect: (a) 3 (three) months after receipt of such termination notice if such notice is delivered on or before September 1, 2016 or (b) 6 (six) months after receipt of such termination notice if such notice is delivered after September 1, 2016.

10.2   By April 30, 2015, Licensor shall deliver or have delivered to Licensee all records, materials, and any other information relating to the intellectual property, including all patent prosecution materials and any information relating to the patent validity and claim scope (the "**Information**"). Licensee shall have until the Diligence Date to perform due diligence analysis on the intellectual property. Licensor shall, upon request of Licensee, provide all reasonable assistance to Licensee in the due diligence analysis. After performing the due diligence analysis and on or before the Diligence Date, Licensee may terminate this Agreement. In this event, Licensee must return the Information to the desired location of Licensor at Licensee's sole expense. Licensee shall be responsible for all freight cost of such materials to and from Licensor. Regardless of whether Licensee terminates this Agreement under this Section 10.2, Licensee shall maintain as confidential all of the Information.

## NOTICES AND COMMUNICATIONS

11.1   Any and all official notices, authorizations, or other communications required or permitted under this Agreement shall be sufficiently given if hand delivered or sent registered or certified mail, return receipt requested, postage prepaid to the addresses set forth below, or other such address as a Party may designate in writing to the other Party during the term of this Agreement:

To Licensor:

Marion Brecheisen
PO Box 234
Coaldale, CO  81222

To Licensee:

Blue Collar Production, LLC
% Peter Partain
14902 Preston Rd
Dallas, TX  75254

### FORCE MAJEURE

12.1 Neither Party shall be liable to the other or deemed to be in breach of any obligation hereunder if its performance is prevented or delayed by causes such as war, riots, acts of civil or military authorities, fire, flood, storm, natural disaster, acts of God, and acts of judicial or regulatory bodies that prevent Licensee's quiet enjoyment of the Licensed Products, provided that the affected Party exercises due diligence in promptly notifying the other Party of conditions which will result in delay or in non-performance and will cure such non-performance as soon as it is reasonably able to do so. For the avoidance of doubt, the Franchise Fee shall not be due during periods subject to the causes cited in this Section 12.1.

### SEVERABILITY

13.1 If any term, provision, covenant or condition of this Agreement is held invalid or unenforceable for any reason, the remainder of the provisions shall continue in full force and effect as if this Agreement had been executed with the invalid or unenforceable portion thereof eliminated and the Parties shall endeavor to replace such invalid or unenforceable portion by a similar but valid enforceable one.

### GOVERNING LAW

14.1 This Agreement, its validity, interpretation, construction and performance shall at all times be governed by the laws of the State of Colorado.

### DISCLAIMER OF CERTAIN BUSINESS RELATIONSHIPS

15.1 The Parties disclaim any agency relationship and state that neither Party has agency authority to act on behalf of the other Party by virtue of this Agreement.

15.2 The Parties disclaim that they are entering into any formal business partnership or joint enterprise hereunder and each party shall retain its independent status as individual or business entity.

### CONFIDENTIALITY

16.1 The Parties agree that this Agreement and its Terms shall be kept strictly confidential and not disclosed to any third party. The Parties agree that all records inspected under Section 6 and all information contained in such records shall be kept strictly confidential and not disclosed to any third party. This duty of confidentiality extends to third parties that have signed a confidentiality agreement under Section 4 herein.

16.2 As an exception to the duty of confidentiality under Section 16.1, Licensee may disclose such confidential information as may be necessary to a third party with whom it contracts for any part of the use, manufacture, marketing, sale, or service of the Licensed Products.

16.3 As an exception to the duty of confidentiality under Section 16.1, either Party may disclose such confidential information as ordered by a court of competent authority

and jurisdiction. Should such confidential information be the subject of a subpoena, the Party receiving such subpoena shall promptly notify the other Party, but the Party owning the confidential information shall have the obligation to challenge such subpoena if that Party so chooses.

## GENERAL PROVISIONS

17.1 This Agreement shall be the entire Agreement between the Parties concerning licensing of rights to the Licensed Products and supersedes any and all prior agreements and understandings, written or oral, of the parties with respect to its subject matter.

17.2 All amendments to this Agreement shall be valid only if in writing and signed by the duly authorized representative of both Parties hereto.

17.3 This Agreement may be executed in separate counterparts, each of which, so executed and delivered shall constitute an original and singular instrument

17.4 This Agreement has been reviewed and negotiated by parties with access to legal counsel, and no rule of construction shall apply hereto or thereto which would require or allow any provision herein to be construed against any party because of its role in drafting the Agreement. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against the Licensor or Licensee, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

17.5 Licensor and Licensee advise each other to seek the advice of an attorney and an accountant in connection with this Agreement, and the Parties represent that each has had an opportunity to seek the advice of an attorney and accountant of their choice in connection therewith.

*[Intentionally Left Blank]*

For and on behalf of Licensor:

*[signature]*
Marion Brecheisen

Date: 3-26-15

For and on behalf of Licensee:

*[signature]*
Name: PETER PARTAIN
Title: MANAGING MEMBER / MANAGER
Date: 3/26/2015

Witnessed by:

*[signature]*
Steven Brecheisen

*[signature]*
Michael Brecheisen

*[signature]*
Lisa Brecheisen

## ACKNOWLEDGMENTS

### Individual Acknowledgment

STATE OF Colorado §

COUNTY OF Denver §

This instrument was acknowledged before me on 26 March 2015 by Marion Brecheisen.

(Seal, if any)

RYAN CHRISTOPHER JONES
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20134036467
MY COMMISSION EXPIRES 6/10/2017

Title (and Rank) Notary

My commission expires: 6/10/2017

### Acknowledgment in Representative Capacity

STATE OF Colorado §

COUNTY OF Denver §

This instrument was acknowledged before me on 26 March 2015 by Peter Partain as MANAGER/MANAGING MEMBER of BLUE COLLAR PRODUCTION, LLC

(Seal, if any)

RYAN CHRISTOPHER JONES
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20134036467
MY COMMISSION EXPIRES 6/10/2017

Title (and Rank) Notary

My commission expires: 6/10/2017

# AMENDMENT TO EXCLUSIVE PATENT AND TRADEMARK LICENSE AGREEMENT

## ("AMENDMENT")

WHEREAS, Marion Brecheisen ("Licensor") and Blue Collar Production, LLC ("Licensee") have agreed to settle all their disputes,

NOW THEREFORE, the parties agree that the U.S. District Court for the District of Colorado shall enter judgement specifically enforcing the Exclusive Patent and Trademark License Agreement ("EPTLA") with the following amendments:

1. Definitions. Capitalized terms not otherwise defined in this Amendment shall have the same meaning as in the EPTLA.
2. RECITALS: The second "WHEREAS" clause shall be deleted.
3. Section 1.1 shall be amended to state: "**Licensed Products**" shall mean: (a) the intellectual property owned now or later by Licensor (the "**Intellectual Property**") related to pump jacks for the extraction of fluids from subsurface formations, which includes but is not limited to, U.S. Patent No. 7,490,674, U.S. Patent No. 7,600,563, U.S. Provisional Patent (62/001/594), U.S. Patent Application No. (14/719,096),and also any later filed patents related to Licensed Products, and U.S. Trademark Registration No. 3462863, as well as all reissues, continuations, continuations-in-part, revisions, extensions, reexaminations, and foreign counterparts of said patents and trademarks; (b) all Licensor's knowledge, know how, and confidential information related to the Intellectual Property and (c) any and all devices, systems and methods that would, except for EPTLA as herein amended, infringe any of the Intellectual Property, either directly or contributorily, or which would induce infringement of any of the Intellectual Property.
4. Section 1.1: delete the last sentence.
5. Section 1.3: delete "(which shall exclude a deduction for the Franchise Fee)".
6. Section 1.3: delete the last sentence.
7. Sections 2.1 and 2.2 are deleted in their entirety.
8. Section 3.1 is deleted and replaced with the following: "Either party may sell Licensor's inventory of eight (8) stationary pumping units and one portable pumping unit and the sales proceeds will be split 75% to Licensor and 25% to Licensee, provided that the lowest sales price of a stationary pumping unit shall be $75,000.00 and the lowest allowable sales price of the portable pumping unit shall be $133,000.00. Any such sale shall be collect/cash on delivery (COD). During the term of the EPTLA as amended and on or before October 31, 2017, Licensee may, at its discretion take possession of the portable pumping unit for a period of twelve (12) months, provided that prior to exercising this option, Licensee shall either obtain $100,000.00 of insurance coverage for damage to the pumping unit or a personal guaranty from Peter Partain for liability for any damage to the pumping unit. Licensee shall be entitled to ownership of the portable pumping unit after payment of three Franchise Fee payments. Otherwise, it shall be returned in reasonable condition subject to normal wear and tear, to Coaldale, Colorado.

1 | Page

9. Section 4.1 shall be entirely re-written to read: Licensor hereby grants to Licensee, who accepts it, an exclusive right and license to the Licensed Products, including exclusive right and license to perform all actions Licensor may perform with regard to the Licensed Products, including but not limited to, to make, have made, assemble, use, import, export, manufacture, exploit, market, advertise, lease, distribute, sell, or service the Licensed Products worldwide.
10. Section 4.2: in the 4th line after the word "Licensor," add "which shall not be unreasonably withheld."
11. Section 5.1 shall be replaced as follows: In consideration of the rights granted to Licensee herein, Licensee shall begin to pay the Franchise Fee hereunder on November 1, 2018, unless the EPTLA as amended, is terminated before that date. Licensee shall pay the 10% Profits Royalty until October 31, 2018, and no deduction shall be made for the Franchise Fee, as there is no Franchise Fee obligation during this time. After November 1, 2018, no Profits Royalties shall be due, and Sections 6.1 through 6.3 shall no longer be in effect.
12. Section 5.3 is replaced with the following: "Licensor shall be reimbursed for business expenses provided Licensor has preapproval in writing from Licensee."
13. Section 5.4: The Diligence Date shall be February 15, 2018
14. Section 5.4: The final sentence of 5.4 shall be deleted.
15. Section 5.5 shall be deleted.
16. Section 7.5 shall be added as follows: "Licensor represents and warrants that he has good and marketable title to eight (8) stationary pumping units and one portable pumping unit in his inventory, and they are free of liens and encumbrances. Licensor warrants that the 8 stationary pumping units and one (1) portable pumping unit are fully manufactured in good working order, and the eight (8) stationary pumping units are like new and have never been in use on a well. Should Licensor breach this warranty, Licensor shall have 8 stationary pumping units and one portable pumping unit restored (or finished manufactured, as the case may be), at his sole expense, to bring the inventory in compliance with this warranty.
17. Section 10.1 is deleted in its entirety and replaced as follows: "Licensee may terminate this Agreement by sixty (60) days written notice.
18. Section 10.2: "April 30, 2015" to be replaced with "March 31, 2017."
19. Add Section 8.3 as follows: "Licensor shall have the exclusive right to control and pursue patent prosecution of all patents pertaining to the Licensed Products, at his own expense. Prior to abandoning or forfeiting any right or proceeding related to a USPTO Related Action on such patents, Licensor shall notify Licensee, in a timely manner, of such impending abandonment, forfeiture or Licensor's intention to not respond so that Licensee has, and Licensor shall give, the opportunity to assume the costs of responding to such USPTO Related Action at Licensee's option. Patent prosecution shall not include any infringement disputes involving third parties, which remains covered by Sections 8.1 and 8.2 of the EPTLA."
20. If there is a conflict between the EPTLA and this Amendment, the terms of this Amendment control.

21. Both parties shall dismiss all claims with prejudice against each other pending in any court. Licensor shall dismiss all claims with prejudice pending in any court against Peter Partain and/or Banner Resources, LLC.
22. <u>Ratification</u>. Except as herein amended, the EPTLA and all covenants, agreements, terms and conditions thereof shall remain and continue in full force and effect and hereby are in all respects ratified and confirmed.
23. <u>Entire Agreement</u>. The EPTLA, as amended, constitutes and contains the sole and entire agreement of the parties hereto with respect to the subject matter hereof and no prior or contemporaneous oral or written representations or agreements between the parties and relating to the subject matter hereof shall have any legal effect.
24. <u>Successors</u>. The covenants, agreements, terms and conditions of the EPTLA as Amended shall bind and inure to the benefit of the parties hereto and their respective successors and assigns. *heirs,* ~~MB~~.
25. <u>Amendment</u>. This Amendment shall not be changed orally, but only by a writing signed by the parties.
26. <u>Incorporation</u>. This Amendment shall be deemed to be a part of the EPTLA, which together with this Amendment shall be deemed to be one instrument, whether or not it is attached hereto.

IN WITNESS WHEREOF, the undersigned have executed this instrument under seal as of the February 7, 2017.

**Licensor:**

**Marion Brecheisen**

(signature): _/s/ Marion Brecheisen_

**Licensee:**

**Blue Collar Production, LLC**

By (signature): _/s/_
Printed Name: Peter Partain
Title: Manager

The undersigned acknowledges and agrees in his individual capacity to his personal guaranty at paragraph 8 of this Amendment, only:

**Peter Partain**

(signature): _/s/ Peter Partain_